[No. 3610.]

## Bob Pierson v. The State.

1. Jury Law.— The State is as much entitled to a fair and impartial jury as is the defendant in a criminal trial. If the examination of a proposed juror on his *voir dire* discloses that he is biased in favor of the defendant, he is as much disqualified, upon the challenge of the State, to sit upon the jury, as he would be upon the challenge of the defendant if his examination disclosed that he was prejudiced against the defendant. See the opinion *in extenso* on the question.

2. Same — Challenge — Term Defined.— The word "bias," as used in subdivision 12 of article 636 of the Code of Criminal Procedure, comes within the meaning of the word as defined by Webster, i. e.: "A leaning of the mind; propensity towards an object; not leaving the mind indifferent; inclination; prepossession; bent." See the opinion *in extenso* for declarations of a proposed juror *held* to constitute bias in favor of the defendant, wherefore the State's challenge as to him was properly sustained.

3. Practice — Evidence.— The indictment alleging that the murder was committed by the defendant and T. P. acting together, it was competent for the State to prove any facts which would show or tend to show that the defendant and his co-defendant did, or could have acted together in the commission of the offense. Under this rule the court did not err in permitting a State's witness to testify as to certain distances and localities, and as to the several ways of traveling from the defendant's house to that of his co-defendant.

4. Same.— It is within the discretion of the trial court to admit testimony of which the relevancy and materiality are not at once apparent, upon the assurance of counsel that it will be followed by other evidence connecting it with the issue to be tried.

5. Same — Conspiracy.— There was not only strong evidence in this case tending to establish a conspiracy between the defendant and his co-defendant to kill the deceased, but positive evidence that they did kill him, and that they acted together in killing him. As a part of the evidence to establish the conspiracy and to show motive or *animus* the State was properly allowed to prove the acts and declarations of the co-defendant, at the house of the witness, on the day previous to the murder. See the statement of the case for the evidence in question.

6. Same.— The State's witness O. was permitted, over objection by the defense, to testify as to what he saw at the house of the co-defendant on the morning after the murder, and likewise, over objection by defense, the witness T. was permitted to testify that he found two pistols at the said house on the said morning. *Held,* admissible in view of the evidence which connected the defendant and the co-defendant in the perpetration of the crime. The rule is that, though the declarations of a co-defendant made after the consummation of the offense, and when the defendant was not present, would not be admissible evidence against the defendant, still, any fact or circumstance (the evidence having connected the two in the perpetration of the crime) which would tend to prove the guilt of the co-defendant, would also tend to prove the guilt of the defendant, and would be admissible against him.

7. Same.— A State's witness was permitted to testify that, at the time the deceased made his dying declaration, some one present asked him if he " could have been mistaken about who shot him? " and that the deceased answered: " I do not think it possible for me to be mistaken as to who shot me." *Held*, that the objection to the evidence, based upon subdivision 3 of article 748 of the Code of Criminal Procedure, was not well taken, the question propounded not being of such character as was calculated to lead the deceased to make any particular statement.

8. Same.— The mere fact that certain of the dying declarations were made in response to questions asked does not take from them their voluntary and spontaneous character. See the statement of the case for the testimony of the State·s witnesses G. and T., as to the dying declarations of the deceased, *held*, properly admitted because they were *res gestæ;* were almost coincident in point of time with the main fact, and sprang out of and tended to explain that fact, and were voluntary and spontaneous.

9. Same.— In determining the propriety of permitting the recall of witnesses who have testified upon the trial, the court below is vested with a wide discretion, and such an one as cannot be defeated by any agreement entered into by counsel in the case. Moreover, it is the duty of the court to exact accessible evidence if essential to the ends of justice. In this case the court permitted the State to recall certain witnesses to testify as to the eye-sight of the deceased, and the darkness of the night on which the murder was committed, notwithstanding they had been discharged from the rule and had heard the defendant's witnesses testify upon those subjects. *Held* that, under the rule announced, the court did not abuse its discretion; and, further, that the evidence was admissible because it was strictly rebutting testimony, and related to matters which could not reasonably have been anticipated by the State.

10. Same.— Bill of Exceptions reserved to remarks made by the trial judge in the progress of a trial, to be considered, must show that such remarks were heard by the jury or by some of the jurors, and that they were calculated to injure the rights of the defendants.

11. Privilege of Counsel — Practice in this Court.— Before this court will reverse a conviction because of remarks made by prosecuting counsel in argument, it must appear that such remarks were improper, and that they were of a material character, and such as under the circumstances were calculated to injuriously affect the defendant's rights. See the opinion *in extenso* for utterances of counsel *held* not to constitute an abuse of the privilege of argument. Note in the same connection the animadversions of this court upon the practice on the part of counsel of expressing in debate their belief of the guilt or innocence of a defendant on trial.

12. Murder — Fact Case.— See the statement of the case for evidence *held* sufficient to support a conviction for murder in the second degree.

Appeal from the District Court of Travis. Tried below before the Hon. A. S. Walker.

The indictment in this case was joint against the appellant and his brother, Tom Pierson, and charged them with the murder of J. C. Stovall, in Travis county, Texas, on the 16th day of March, 1885. A severance being had, the appellant was first placed upon

trial, was convicted, and awarded as penalty a term of thirty years in the penitentiary.

Dennis Corwin was the first witness for the State. He identified the following as a correct diagram of the locality along and adjacent to the Lockhart road from the San Antonio road to Bluff Springs:

Referring to the diagram, which he stated was sufficiently accurate for all practical purposes, the witness testified that the distance from the lane at Gagnan's house, across the country to Tom Pierson's place, was about a mile. Pilot Knob is nearly east from Gagnan's place. It is probably three quarters of a mile from the widow Pierson's place to Boggy creek. From Boggy creek to Onion creek, the distance is about three quarters of a mile. From Onion creek to Felix Smith's field gate, it is about a half a mile. There was a very high bluff on the south side of Onion creek. It is not so high at its perpendicular as at other points. Felix Smith's house is situated on a hill at least sixty feet high, which hill slopes back from the road. The country has a gradual rise from Boggy creek all the way to the widow Pierson's house, where a level with Felix Smith's house is attained. The distance from the widow Pierson's back to the end of the Thaxton lane is fully a half mile. The country between Gagnan's and Tom Pierson's is open, with a few scattering trees.

Mrs. Felix E. Smith was the next witness for the State. She testified that she lived seven miles from the city of Austin on the Lockhart road. Doctor Stovall, the deceased, lived on the Lockhart road. From the "bridge" to the big gate on the place of the witness and her husband, the distance is some three or four hundred yards. From the road to the house the distance is four, five or six hundred yards. Doctor Stovall was at the house of the witness to see her sick child on the night of March 16, 1885. He left that house to go home between fifteen and thirty minutes past 9 o'clock, P. M. Witness knew the time accurately, because she was directed to administer medicine at regular intervals, and commenced at fifteen minutes past 9, some five or ten minutes before the doctor left. To get home the doctor had to go through the big gate and into and along the Lockhart road. Deceased was shot that night, according to witness's understanding, some six or eight minutes after he left witness's house. Witness saw the doctor at Mr. Gagnan's on the evening of the day after he was shot. He was not armed when he was at witness's house, so far as she knew. He was sober, sensible, and in full control of all his faculties. He remarked to witness as he left: "If anything happens and you need me, send for me; I will be at home." The distance between the houses of the witness and Doctor Stovall was two miles and a half.

Cross-examined, the witness stated that she thought it was after 8 o'clock when Doctor Stovall reached her house, and he remained there about an hour. He remained not more than twenty minutes

after giving the medicine.   When the witness administered the first dose, some ten minutes before the doctor left, her clock, which her husband told her was slow, called for fifteen minutes past 9 o'clock, and the doctor remarked that 11 o'clock would be the hour for the next dose.   It was perhaps between a quarter and half-past 9 o'clock when Fritz Odenheimer informed witness that Doctor Stovall had been shot.

Felix E. Smith was the next witness for the State.   He testified that he had lived at his present place since 1856, and was familiar with the localities indicated on the diagram.   Bob Pierson lived near Pilot Knob and between four and five miles (as traveled) east or a little south of east from G. W. Rose's house.   The nearest route from Bob Pierson's to the widow Pierson's was through Caperton's farm.   The traveler over this route would take what is known as the lower Austin road until he got to the bluff on Williamson's creek, on the west bank of which he would strike the open part of the lane, leave the Lockhart road, and go into an open space between the farms of Swank and Jim Smith; thence through a narrow lane which opens out at Moore's and Smith's farms, where the lane diverges; thence a half mile to a point where the fences converge again; thence between four and six hundred yards to Rose's and into the lane by Rose's house to the Lockhart road.   To go around by the gate in witness's pasture and by Tom Pierson's house, the route would be from a half to a mile longer.   The nearest route from the widow Pierson's to Tom Pierson's house would be to go through the gate in front of Gagnan's or Moore's place; thence through the gate in the lot to the back of the house, and travel eastwardly through a gate in Moore's fence on the bank of Onion creek, and there take a bend to Tom Pierson's house.   This is the best horseback route.   The best wagon route was through witness's place.   Another route to Tom Pierson's house would be around Wade Smith's house and orchard to a point on the creek whence a road leads along the bluff to Tom Pierson's house.   The next shortest route to Tom Pierson's house from the widow Pierson's would be to cross Boggy creek to the Lockhart road, through the fourth gate on the left of witness's place, go through the pasture across Onion creek, bearing down the creek to get up the bluff, and up to Tom Pierson's house.

The defendant had been living in that neighborhood since the summer or fall of 1869.   He lived first at Moore's place, then at two or three different places up and down the creek, until seven or eight years ago, when he bought his present place.   The deceased

moved into the neighborhood in the fall of 1875, and lived there until his assassination. Bob and Tom Pierson both knew Doctor Stovall well. The latter practiced in defendant's family, as physician, six or seven years ago. His practice extended to every family in the neighborhood, with very few exceptions. Doctor Stovall rode about the country a great deal at night. Witness met Tom and Bob Pierson on Williamson's creek, about four and a half miles from Austin, on the morning of March 16, 1885,— the day of the killing. They were riding bald-faced horses, one being a sorrel. Bob and Tom Pierson farmed black land, and it was too wet on that day to plow that character of land. Bob Pierson would not get into the Lockhart road on his direct route to Austin from his home.

" When you get to the end of the turn-row it is something less than a half mile to Tom Pierson's house. If he take the left hand end of the turn-row, it takes him in seventy-five yards of Tom Pierson's, and if he would take the other end it would lead on towards Bob Pierson's, passing through Jim Smith's horse pasture, his gin pasture, out into a road leading from the outer to the lower Lockhart road; thence eastward to the lower Lockhart road; thence in different directions, through lanes, gates and pastures, on to Bob Pierson's house. From the end of the turn-row to Bob Pierson's the way commonly traveled is somewhere between three and four miles. The clock used in my house was usually regulated by suntime, between which and city or railroad time there was a difference of some ten or fifteen minutes. From the fourth or big gate in my woods pasture, on the Lockhart road, back to the bridge, the distance is about a quarter of a mile."

Cross-examined, the witness testified that the distance between Wade Smith's and Doctor Stovall's places, by the Lockhart road, was about three and a half miles. From witness's to Wade Smith's is about a mile. It was a mile or less from the bridge on Boggy to the crossing on Onion creek. From the Boggy bridge to the widow Pierson's the distance is from a quarter to a half mile. From the creek to Wade Smith's store the distance is a little more than three quarters of a mile. The general direction of the Lockhart road is a little east of south. At the junction of the fences of the witness and Wade Smith there is a gap, through which people sometimes pass in going to Jim Smith's. Tom Pierson's house is in a field. Bob's (defendant's) is not far from Caperton's line, and it is a little less than a mile from Bob Pierson's house to Caperton's house. Defendant's nearest route to Austin, if the gates are open, is through

McKinney's place; if the gates are closed, then through Caperton's pasture.

The point on Williamson's creek where the witness met Bob and Tom Pierson, as stated, was about a mile north of Doctor Stovall's. Witness was in a buggy, and sometimes was ahead and sometimes behind them on the way to Austin. Witness left home between 6 and 7 o'clock, and reached Austin about 9. The parties were traveling the direct road from the widow Pierson's to Austin. Witness had no recollection of seeing the Piersons in town on that day. It had rained on the Saturday and Saturday night, and perhaps on the Sunday morning, previous to the killing. Mrs. Moore's house is not exceeding two hundred yards distant at its nearest point from Schaeffer's. Gagnan's house is a little over a hundred yards from the road, and is elevated above it fifteen or twenty feet at the gate entrance.

On redirect examination, the witness stated that directly across and on the pasture side, south of the gate, two pecan trees stood. A dead hackberry tree stood some ten or fifteen feet further down, and these were the only trees in the immediate vicinity of the witness's pasture gate. It is about one hundred and seventy-five yards from the gate that opens into Gagnan's place, to the bridge, and from the bridge it is about one hundred and fifty yards to the point where the deceased is said to have been shot, and the trees mentioned by witness stood from twenty-five to fifty yards from the spot. There was nothing about the vicinity to obstruct the view. The lane is from thirty to forty feet from fence to fence. There is a gully running along the lane, for drainage, from two to four feet deep. It has but little depth for thirty feet in front of Gagnan's. Mrs. Pierson's place is situated on ground perhaps twenty feet lower than witness's. A night traveler can see better going up than down hill, because of a light or star-lit background.

Re-crossed, the witness said that there was a large live-oak tree in front of Odenheimer's house. Beyond, some twenty-five feet, and on the east or pasture side of the road, there are several trees. There is a pretty well-timbered sag, further back on the road. For thirty or forty yards from the bridge the ground is quite level, but thence forward to the gate the rise is general and about one foot in twenty.

Mrs. Jane Pierson was the next witness for the State, and it was with respect to her testimony that the defense raised the objections considered in the fifth head-note of this report. She testified that

she was the widow of the deceased brother of Bob and Tom Pierson. Witness had four of her five children at home on March 16, 1885, the day of the killing. Their names were Nancy Jane, Mashac, Tom, and Eliza Tea. Nancy Jane and Mashac were then sick, and both have since died. On the day before the killing, which was Sunday, March 15, 1885, Doctor Stovall was the physician in charge of the sick children. Tom Pierson on that day, without the knowledge or consent of the witness, changed doctors for Mashac, employing Doctor Cummings, but Nancy Jane refused the change. Tom Pierson did not stay at the witness's house on Saturday night. He came there on Sunday between 9 and 10 o'clock. Mashac had, on that Sunday, been sick six days, complaining of his throat, which Doctor Stovall had been treating. Tom Pierson went for the new doctor on that morning. Bob Pierson, the defendant, had not then arrived at the witness's house, but came between 10 and 12 o'clock. Witness and defendant had not been friendly or on speaking terms since the death of the wife of Bill Davis in February, 1884. Tom Pierson returned to witness's house between 2 and 3 o'clock, and Doctor Cummings arrived between 4 and 5, staying but a few minutes, leaving medicine, the same, the witness thought, that had been prescribed by Doctor Stovall. Both Tom Pierson and the defendant, and Bill Davis, stayed and sat up all of Sunday night at witness's house, and the two Piersons went to Austin early next morning. Witness knew no more about the description of the horses ridden by the two Piersons than that both were bald or blazed face. The Piersons returned from town to the witness's house between 2 and 3 o'clock on the evening of the day of the killing, and both were drinking somewhat. They brought with them three bottles of whisky, gave one to Mashac and retained one each. They ate dinner at witness's house, and left an hour later. Defendant told witness, when he left, that he would be back between 11 and 1 o'clock on the next day, and witness heard Tom tell Nancy Jane that he would be back that night. Deceased was at the house of the witness on that evening at about 5 o'clock. Tom Pierson had told Nancy Jane to get Doctor Stovall's fever-tester, but as the doctor had other use for it that night he did not leave it.

Tom Pierson did not return to the witness's house that night. Defendant did not come back next day. Witness did not know when they were arrested. Tom lived about one mile from the witness, and the defendant four or five miles. Witness was unable to say whether or not defendant was a friend to Doctor Stovall, but had heard him,

defendant, talk about and abuse Doctor Stovall. Witness had heard him talk about, curse and abuse Doctor Stovall more than once at his own and other houses. Bill Davis was the defendant's brother-in-law and witness's son-in-law. Defendant said nothing violent against any one at the witness's house on the fatal Monday, that witness heard, nor did Tom, except to curse witness's son Tom. The two different routes from witness's house to Tom Pierson's house were about equi-distant. Witness did not know which route they took on leaving her house that evening.

Cross-examined, the witness said that she had lived in Texas five years, coming here a widow. Witness could not say whether Mashac was awake or asleep when Tom Pierson arrived at the house on March 15. If Mashac sent word for Tom to come to the house, witness did not know it. Witness did not speak to Tom Pierson from the time that he came to her house until he left. She heard Tom Pierson ask Mashac whether or not he wanted a doctor, and heard Mashac reply that he did, but he designated no particular doctor. Tom Pierson then said that he would go to town (Austin) and get Doctor Taylor. He said nothing about Doctor Cummings when he went to town. Witness told him to get Doctor Bennett, but he claimed not to have heard this direction. Witness did not object to his employing a doctor for her sick children, as she wanted the sick to have whatever doctor they wanted. Tom Pierson left for town to summon the doctor before 12 o'clock, and Bob arrived between 10 and 12. Witness awaited Tom's return from town before serving dinner on that day, Monday. Witness did not remember whether or not the two Piersons ate dinner together at her house on the day before. Defendant came to the house before dinner on that day, and stayed until next day, sitting up with 'Shack (Mashac) on Sunday night. Tom went home Sunday evening, but returned and stayed all night, bringing coffee with him to serve to the watchers. Bill Johnson and William Davis were among the watchers. Witness and Doctor Cummings exchanged no words. Medicine was brought to 'Shack on Monday, which Bob said that he bought. Defendant and Tom left witness's house about 4 o'clock on Monday evening, but witness did not know which way they went. Witness remembered that Jasper Grindstaff and Pat Cain were at her house on Sunday night, but had no recollection as to Mr. and Mrs. George Rose being there. They were there nearly every night for awhile, but never stayed all night. Witness had been unfriendly with defendant for nearly thirteen months, and had not been about him for two years past. She had not heard defendant talk about Doctor

Stovall within two years past, that she could remember, nor could she recall any language that she had ever heard him use, but knew that it was abusive.   She had no recollection of ever hearing Tom Pierson say anything about the deceased.  'Shack was nineteen years and ten months old at the time of his death, and Nancy Jane twenty-seven.

Mrs. Mary Rose testified, for the State, that she was present at the trial of Marcellus Costley for the murder of the defendant's son, in July, 1883.   Doctor Stovall testified as a witness in that case. After Doctor Stovall had testified in that case, defendant came to witness in the court room and said: "Doctor Stovall swore to a G—d d—d lie."

Cross-examined, the witness stated that she and her husband were at the house of the widow Pierson for awhile on the Sunday night before the assassination.   Bob and Tom Pierson, Jasper Grindstaff, the two Bill Johnsons and Pat Cain were there.

G. W. Rose testified, for the State, that he saw Doctor Stovall after he was wounded and after he died.   He died at Mr. Gagnan's house, about a half mile from the witness's house.   Bob Pierson, the defendant, had been angry with, and harbored ill feeling against Doctor Stovall for a number of years, and had often, in the hearing of the witness, spoken of Doctor Stovall in very abusive language. Witness could not recall the exact language used by defendant on such occasions.

Cross-examined, the witness stated that he had heard defendant say " d—n him,"— meaning deceased — that he was "no doctor, and was of no account, and would kill so-and-so."   He had heard defendant speak of the deceased since the trial of Marcellus Costley, but could not recall the language used.   He had heard that defendant and deceased had afterwards made friends.

W. H. Douglass testified, for the State, that late in 1878 or early in 1879 he was sick with fever on the defendant's place, and was taking medicine prescribed by the deceased.   Defendant asked the witness: "Don't you know the d—d stuff will kill you?" and told witness that the deceased had attended a child of his in sickness, and kept him a long time in bed by his treatment, and then sued him for pay, and caused him, because destitute of money, to sell a favorite cow to get it, saying in the same connection that if he, defendant, lived long enough he would kill Doctor Stovall.

The defendant told the witness, during the Marcellus Costley trial, that there were a great many witnesses in that case who pretended to know, but who knew nothing about it; that Doctor

Stovall was there "and had to stick his d—d old mouth in." At one time, the witness could not recall when, defendant said that if he ever caught Doctor Stovall in the river he intended to drown him. Witness saw Bob and Tom Pierson in Austin on the day of the killing. One of them called young Tom Pierson, and witness started to go to them with young Tom, but became impressed with the idea that they did not want him. They showed some little excitement, and witness did not join them. Bob Pierson, whose usual practice it had been to inquire of witness about his family, said nothing to him on that day. Witness did not hear of the killing until Tuesday morning.

Cross-examined, the witness testified that the declaration about Doctor Stovall, made by defendant during the Costley trial, was made on the last day of the trial, in Frischmeyer's saloon. Defendant asked witness to go and take a drink just before Colonel Wash Jones was to speak. Going into the saloon, witness remarked: "There were a great many witnesses in this case." Defendant replied, "Yes, and a good many who knew nothing about it, and there is old Stovall; he had to stick his d—d old mouth in." Witness thought, but was not certain, that Bill Davis was present. When the Piersons called young Tom, as stated by witness, in Austin, the witness noticed that they were somewhat excited, did not look as usual, and he thought then that something was up, but could not tell what. Witness was subpœnaed in this case because of a remark he made when he heard of the shooting, and he tried to get off, as he had work to do. He was subpœnaed as "Buck" Douglass, but refused to obey, and was then summoned by his right name.

Austin Wallace was the next witness for the State. He testified that he went from Mr. Carpenter's house to that of Doctor Stovall on the Saturday night before the killing, traveling the lane by George Rose's until he got to the Lockhart road. It was a dark, rainy night, and the lightning played vividly and almost constantly. Witness saw a man that night ahead of him about one hundred and fifty yards, riding along the road in the lane. He next (soon afterwards) saw him squatted down in a fence corner, holding his horse, and by a flash of lightning recognized him as Bob Pierson. Witness passed him at a distance of ten or fifteen feet, but did not speak. Returning over the same road from Doctor Stovall's, witness saw the defendant again. He was then in the open, about one hundred and fifty yards from where witness previously saw him, standing by his horse.

Cross-examined, witness said that when he first saw the man

ahead of him that night, he could not tell who he was. He recognized him, however, beyond all doubt, when he passed him squatting in the fence corner. Witness heard of the shooting of Doctor Stovall, and on the next Tuesday, thereafter he told him of seeing defendant on the previous Saturday night under the circumstances narrated. Witness told no one else until subpœnaed in this case. Witness only knew defendant by sight. Witness was subpœnaed as a witness upon the *habeas corpus* trial, but did not testify; that trial was concluded before examination of all the witnesses summoned. The district attorney did not talk to witness before the *habeas corpus* trial.

Miss Lou E. Swank testified, for the State, that about 5 o'clock on the afternoon of March 16th, the day of the shooting, she met the defendant and Tom Pierson about three hundred yards this side (towards Austin) of the place where it is said Doctor Stovall was shot. Witness was traveling towards and they from Austin. She asked them how the invalids were progressing, and they said better. Witness then asked if the doctor would soon be in attendance. They said that he would be on the next day. They referred to Doctor Cummings. Bob Pierson was riding a bald-faced sorrel horse.

William H. Thaxton testified, for the State, that he saw Tom Pierson and the defendant on the morning of Monday, March 16, 1885, going towards Austin, riding bald-faced sorrel horses. He saw them again that evening between 4 and 5 o'clock. They were then on the Lockhart road, near Felix Smith's place, going towards Lockhart.

Fayette Smith testified, for the State, that he passed Tom Pierson on Onion creek, between 4 and 5 o'clock, going towards Wade Smith's store. Witness arrived at the store first, and Tom Pierson a few minutes later. When witness left, about three quarters of an hour later, Tom was stretched on the ground between the store and the blacksmith's shop talking to some gentleman.

Jim Roundtree, colored, testified that he saw Bob Pierson near Tom Pierson's house, on the evening of March 16, 1885, and left Tom Pierson at Wade Smith's store, about 5 o'clock on that evening.

Jim Overton, colored, testified, for the State, that he saw Bob Pierson in the yard at Tom Pierson's house about half-past 4, or perhaps a little later, on the evening of March 16, 1885.

Fritz Odenheimer was the next witness for the State. He testified that he lived on the Lockhart road, from seventy-five to eighty yards south of the bridge on Boggy creek, twelve or fifteen yards

from and on the west side of the lane. Witness was at home on the night of the assassination. He heard, first, one shot, opened his door and heard four more, and saw the flashes from the last shots. Those shots were fired in the lane, in the direction of Austin, and about two hundred yards from the bridge. It is between two and three hundred yards from that bridge to the gate leading into Gagnan's place, and from that gate back to where the shooting occurred the distance was about fifty yards. After the first shot was fired some one called for help, and this call was followed by four shots fired in rapid succession. Just after these last shots two men crossed the bridge in a gallop, and, as they passed witness's house, one of them remarked: "We have no time to lose; let us ride, for God's sake." Witness then saw a lantern go from Gagnan's place towards the place of the shooting. The two men who crossed the bridge, and passed witness's house, came from the place of the shooting, and were riding as fast as their horses could carry them. When he heard the parties coming from the bridge, witness blew out his lamp, which was then burning near the door. A large live-oak tree stood in front of witness's house and made so dark a background that witness could see no one who passed. Besides, the night was very dark, and the parties had passed before witness recovered from the partial blindness into which he was thrown by suddenly extinguishing the lamp. Witness went at once to the house of Felix Smith, and told two men he found there of the shooting, and what he had seen.

One of the parties at Felix Smith's went with witness to the scene of the shooting, and got there just as Doctor Stovall was being moved into Mr. Gagnan's house. Witness found Doctor Stovall's horse as he passed into the lane on his return from Smith's. Witness tied the horse to the fence and went on to Gagnan's, where he arrived at a quarter to 10 o'clock by Gagnan's clock. About ten minutes had then elapsed since the two men, fleeing from the scene of the shooting, passed witness's house, going towards Wade Smith's store. Jasper Grindstaff, Pat Cain and witness went to Wade Smith's store after Doctor Davidson. Wade Smith, Hart, Doctor Davidson and a blacksmith, whom witness did not know, were at the store.

Witness, with Wade Smith, Felix Gatling and John Tulk attempted, on the next day, to trail the murderers by the tracks of the horses. Passing through the gate, about a quarter of a mile beyond Wade Smith's store, they passed a place where the fence had been let down and two horses had passed through from Felix Smith's.

At this place the tracks of two men were found. The tracks of the two horses went on to the turn-row leading through Jim Smith's field. One end of this turn-row would lead to Tom Pierson's house. Witness did not know where Bob Pierson lived. Following the turn-row down by the fence one would be about a half of a mile from Tom Pierson's house. Witness did not personally examine the tracks, but saw them examined by Smith, Gatling and Tulk, and saw Smith take measurements of the horse tracks. Witness saw Doctor Stovall at Gagnan's house after he was shot, and before he died. His death occurred on Wednesday, in the morning, the second morning after he was shot.

Cross-examined, the witness testified that his view of the road in front of his house was obstructed by a line of trees. The night was dark, but would not appear as much so to one who had been out long enough to accustom the sight as to another just emerging from a light. The shots were fired in the road north of the bridge. Witness went straight up the hill to Felix Smith's, one hundred and fifty yards distant, and reported there, as soon as the men had passed his house. Witness ran the distance, stayed about three minutes, and ran the distance back to Gagnan's house. Witness afterwards mounted Bill Johnson on a mule and sent him to notify Mrs. Stovall, and he and Grindstaff and Cain (Grindstaff alone armed with an old pistol) went in pursuit. When they reached Wade Smith's store Smith told them to wait for him near Tom Pierson's. From Wade Smith's the party went on a couple of miles to the house of Maderis, where they got arms, and thence they went to a point near Tom Pierson's and secreted themselves in a small clump of timber. The parties who did the shooting had about an hour start of the pursuing or searching party. Remaining in the timber near Tom Pierson's about three quarters of an hour, the witness and his two companions went back to Gagnan's, and thence to Austin to report the facts, starting to Austin at a quarter to 12 o'clock. There were several tracks at the point where the fence between the fields of Felix and Wade Smith had been let down.

On redirect examination the witness testified that Tom Pierson was arrested between daylight and sunrise on the next morning. The family was up, breakfast was on the table, and the two boys were at the cow pen, but Tom Pierson was in bed. The witness and the arresting party surrounded the house at day-break, and kept themselves concealed until the two boys went to the cow lot. This is the witness whose testimony, in connection with that of John C. Tulk, next set out, is the subject-matter of the sixth head-note of this report.

John C. Tulk, a blacksmith, who lived about one hundred yards from Doctor Stovall's house, testified that between a quarter to 10 and 10 o'clock, on Monday night, young Wallace came to his house in quest of a doctor, and told him of the shooting. Witness wrote a note to Doctor Swearingen, at Doctor Tobin's drug-store in Austin, and rode over to Gagnan's. Examining for tracks on the next morning, witness had occasion to go under the Boggy creek bridge, and there saw where some one had stood and held a horse. This was indicated by the small space over which a multitude of tracks extended. Witness, from his cow lot, saw Tom Pierson and the defendant, the latter riding his bald-faced sorrel horse, which he called "Gatlin," traveling the San Antonio road, towards Austin. The horse tracks under the bridge were more or less disfigured, and the witness succeeded only in getting a correct measure of one between the heel points, which measured three inches. The measure was afterwards applied to the heel points of defendant's horse's shoes, and found to correspond exactly. The tracks under the bridge were made by swilled-heeled horse shoes, and such shoes were worn by all of defendant's horses.

Witness went to Tom Pierson's house about noon on Tuesday, with orders to secure such pistols as could be found on the place. Mrs. Pierson gave witness two pistols from one trunk, and one pistol from another trunk, which pistols witness turned over to Justice Von Rosenburg. From Tom Pierson's, witness and his party went to Felix Smith's pasture, and thence, about 2 o'clock, to Bob Pierson's. The distance between the houses of Tom and Bob Pierson was between two and a half and three miles. Witness did not go inside of the house of Bob Pierson, and made no search there for weapons. The tracks found under the bridge had been made within twenty-four hours.

Cross-examined, the witness stated that he had no recollection of seeing the tracks of a man under the bridge. That the tracks were made within twenty-four hours was not guess-work, for they were made after the rain, but witness could not tell when, within the twenty-four hours, they were made. The tracks were immediately in the bed of the creek, but there was no water nearer than fifteen or twenty feet. Witness measured the track not earlier than 10, nor later than 11, o'clock on the morning of March 17, 1885. There was no evidence that more than one horse had been under the bridge. The bed of the creek is twelve or fifteen feet under the bridge. Defendant's bald-faced horse was some five or six years old, and his foot is long and shaped like a mule's. Swilled-heeled shoes, and horses measuring three inches between the points of the

heel, were common. Two of the pistols secured at Tom Pierson's were five-shooters; one having a nickel-plated and the other a gutta-percha handle; and the third was a pepper-box pistol. Two chambers of the nickel-plated five-shooter had the appearance of having been recently discharged. "The Good Lord only could tell when that pepper-box pistol was last fired."

On redirect examination, the witness stated that the shoes on Bob Pierson's horse's feet were worn down pretty smooth. The shoes that made the track measured by the witness made no scratch on the ground.

In substance Thomas M. Lee testified, for the State, that on one night in December, 1884, he, one Rebman and defendant were sitting up with one Ben Davis, who was very sick and in charge of Doctor Davidson. During the night the three left the sick room in company. The witness and defendant took a seat on a woodpile in the yard, and Rebman walked on some few steps. Witness remarked that old Mrs. Davis did not seem to appreciate the service that he, witness, was rendering her. Defendant replied, in substance: "You must not blame me, although it is all on my account. They know that I have no use for 'Stobuck' (meaning Stovall), and that I don't use him as a doctor in my family at all; and that is the reason they are cutting up about you so to-night. If old Stobuck was here attending this case instead of 'Yank-Leg' (meaning Davidson), everything would be all right. They don't give a d—n for Yank-Leg, nor anything else. They behave this way to aggravate me because me and my family don't like Stovall, and I am afraid my relatives, by employing Stovall, are going to keep on aggravating me until I do something I don't want to do. If they keep on employing Stovall when they get sick, I'll put an end to the G—d d—d son-of-a-b—h, and then I reckon they will quit preaching up Stobuck to me." Defendant's wife was Davis's sister.

Cross-examined, the witness said that he saw Doctor Stovall at Davis's twice, during his, witness's, services as attendant on the sick. Stovall asked nothing about the case on either occasion. He came there both times with Doctor Davidson.

G. C. Stovall, the son of the deceased, testified that the deceased left home about sundown on the evening of March 16, 1885. Witness next saw him between 11 and 12 o'clock at M. D. Gagnan's house, wounded, from which wounds he died on the following Wednesday morning. Witness had known defendant some seven or eight years. Defendant and deceased were well acquainted. Witness knew of a difficulty which occurred between the defendant and

the deceased in Austin. Deceased called Bill Davis, who was talking to defendant, to speak to him. When Davis stepped towards the deceased, defendant began to curse and abuse deceased, denouncing him as a d—d rascal and a d—d thief, and charging that deceased had killed one of his, defendant's, children. Deceased had defendant arrested, and appeared against him in the mayor's court, where defendant pleaded guilty. This occurred four or five years ago.

Shortly after the November elections (1884), the defendant drove back and forth before Doctor Stovall's house six different times within thirty minutes. Once, in the fall of 1879, while the witness was driving a small bunch of cattle to a water hole near defendant's house, and grazing them along on some uninclosed land, the defendant approached the witness and the two had some words. Defendant cursed witness, and threatened to kill witness's father.

John E. Rebman testified, for the State, that about three months before this trial he heard the defendant say that the deceased doctored one of his children to death, and gave him medicine that kept him in bed a year. At that time witness saw three pistols hanging up in a room on defendant's place. On another occasion, while sitting up with Ben Davis, witness heard defendant tell T. M. Lee, while the defendant and Lee were sitting on a woodpile, that they (the Davises) kept Doctor "Strobuck," meaning deceased, just to spite him, defendant. Other talk passed between defendant and Lee, but was not heard by the witness.

Mrs. Mary D. Stovall, widow of the deceased, testifying for the State, said that young Wallace, who had testified as a witness, came to Doctor Stovall's house on the Saturday night before the assassination, to summon the deceased to see Carpenter's sick child, which the deceased had been attending for some two weeks. He stayed but a few minutes and left to return to Carpenter's. It had rained on that day and the night was stormy. Deceased left home on the fatal Monday night, after having eaten his supper, to go to the house of Mr. Felix Smith, to attend a sick child. The witness next saw him, wounded, at Mr. Gagnan's house, between 11 and 12 o'clock. He told the witness that he was going to die; that he was so wounded that recovery was impossible, and that speedy death was inevitable. Although he was suffering, his mind was as clear and collected as the witness had ever known it. He talked to the witness, in the presence of others, about his business matters, asking her to control herself until he talked some, as he would have but a short time to live. He then discussed his business matters as clearly as he ever had. Witness's son asked, "Pa, who shot you?" De-

ceased replied: "Tom Pierson and Bob Pierson shot me. I knew them as soon as I met them. They divided and rode right close up, one on one side, and the other on the other side. Tom Pierson fired the first shot, and the horses then turned about so I don't know who fired the second shot. At the first shot I fell from my horse. After I was down they rode off towards Mr. Felix Smith's, across the bridge, in a great hurry, and I called for help. They heard me and came back and shot several times, but did not hit me. They then went off, cursing me and telling me to take that. I was afraid to make any more noise for fear they would come back, and waited until they got out of sight, when I crawled across (or out of) the ditch." From the first until his very death Doctor Stovall, who knew Tom and Bob Pierson well, and their horses equally well, asserted that he was shot by Tom and Bob Pierson.

Deceased, when he first moved to the neighborhood, some seven or eight years ago, practiced in Bob Pierson's family, and during the time treated one of his, the defendant's, children, which eventually died. Deceased rode somewhere, practicing his profession, almost every night. Witness had never before heard any complaint of his eye-sight being feeble at night. Witness had been with him frequently at night, and had seen him recognize people at night when she could not. Witness had two children, both married, and an adopted child.

Wade Smith testified, for the State, in substance that he was sitting in a room at his house (shown on the diagram, and located by witnesses) something later than 9 o'clock on the night of Monday, March 16, 1885, when he heard certainly two and he thought at least three persons pass up the lane in a fast gallop, going towards Lockhart. Witness supposed at the time that this party belonged to a crowd of young men who had gone fishing on that day. Within twenty or thirty minutes Fritz Odenheimer, Jasper Grindstaff and Pat Cain arrived and told witness that Doctor Stovall had been shot and summoned him and Doctor Davidson to attend him, at Mr. Gagnan's house. Witness went to Gagnan's immediately and found Doctor Stovall lying on a lounge in Gagnan's house. Witness helped undress him, to probe the wound; then went to his store, a mile distant, for chloroform, and returned. On the next morning Sheriff Hornsby deputized witness to go with Thorp to arrest Tom Pierson. They arrested Tom Pierson in bed, and ate breakfast with him.

Examining for horse tracks on Tuesday morning, the witness and a party found where some one had passed through a gap from Felix

Smith's place into the witness's field.   This gap was some forty yards from the gate between the two places.   Two horse tracks went down the fence, going east, and one went west.   Those going east passed last, as shown by the fact that, before diverging, they had trampled out some tracks of the one going west.   Witness measured one track up near the grass plat.   The one track going west and one of the tracks going east seemed to be the same track.   Witness measured the track with a square and compass, across the centre, where it measured five and three-eighths inches.   The horses going east traveled in an ordinary gate; that going west traveled in a gallop.   Witness knew that the defendant did not like Doctor Stovall. Witness heard him curse the deceased in Austin on the occasion testified to by G. C. Stovall, and paid his fine for him.   At another time witness heard defendant say that Doctor Stovall swore a d—d lie from the stand in the Costley trial.   Witness saw the place where, it was evident, Doctor Stovall fell when shot, and the trail he made in crawling through the fence.   Witness's house was thirty-five or forty yards from the field gate.   The road from that gate strikes Tom Pierson's house.

On redirect examination the witness said that he saw the tracks of two men at the gap, who had evidently held their horses a few moments at the gap.   Witness did not notice these two separate tracks in close juxtaposition.

W. D. Miller testified that the soil about the point where Doctor Stovall fell was of white *adobe*.   A man could see better at night on such soil than on dark soil.   Monday night, March 16, 1885, was a clear, cloudless, starlight night.

Doctor R. M. Swearingen testified, for the State, that he first saw Doctor Stovall, after he was shot, about 9 o'clock on the next day, at Gagnan's house.   The wound through the illium of the right thigh witness from the first thought fatal.   Witness went back about 11 o'clock on the same night (Tuesday) and left him next morning about 6 o'clock in a dying condition; returned that night and found him dead from the effects of the said wound.   When the witness paid his first visit he found Doctor Stovall's mind perfectly clear, and his mental faculties in no wise impaired.   He, Doctor Stovall, thoroughly appreciated his condition, and assured witness that the wound would kill him.   He made a voluntary statement as to how he received his wounds, in the presence of the witness.   No questions suggesting answers were asked him.   Witness did not think that, at the time, he had the faintest hope of recovery in his mind. Doctor Stovall said that on his way home he was met in the road by

Tom and Bob Pierson; that Tom shot him, and he fell from his horse; that he cried out for help, until it occurred to him that if he ceased to cry out they would stop shooting; that he did so, and, after firing one or two more shots, they left him, and after they got far enough away not to hear him he began crawling towards the house. Some one asked him if he could be mistaken about the parties who shot him, and he said that he did not think it possible that he could be mistaken. This testimony was objected to, and is the question involved in the ruling stated in the seventh head-note of this report.

Cross-examined, the witness stated that deceased said that he could not be certain that Bob Pierson did any of the shooting; that the prancing of the horses prevented him from seeing Bob actually shoot, if he did. Very little could be or was done to the wound except to relieve the pain. Witness, in repeating the language used by deceased, said: One of the Piersons said "take that, G—d d—n you!" or "I have settled you, G—d d—n you."

M. D. Gagnan testified, for the State, that from a wound received near his, witness's, house, on the night of Monday, March 16, 1885, Doctor Stovall died at witness's house on Wednesday morning, March 18, 1885, at twenty minutes before 7 o'clock. Witness helped bury him. Witness got home late on the night of the shooting, and had just finished supper, and was filling his pipe when he heard two shots in the direction of the road. He ran out instantly, and heard two more shots and some one groaning as if in great distress. Calling to Mr. Tumberlin, one of the men in the house, to go with him, the witness ran in the direction of the point from whence the groaning proceeded, and had got about half way when he heard his name called. Witness stopped to catch the direction of the voice, and asked: "Who is it," and received the reply "Doctor Stovall." Witness ran up to the deceased, and he said in a groan: "Mr. Gagnan, I am shot." The deceased lay about one hundred yards from the witness's house, and witness reached him three or four minutes after the first shot was fired. Witness asked: "Doctor, do you know who did the shooting?" Over objection, witness answered that the deceased replied "Yes; Tom and Bob Pierson." Witness asked: "Young Tom," and deceased said "No, old Tom and Bob." Witness then asked how many were in the party, and he said two. Deceased remarked that he did not think they ought to have shot him, as he had never harmed them. Doctor Stovall was about forty yards inside the yard from where witness and Tumberlin reached him. Just after the shooting witness heard some parties going across the bridge in a lope. Witness sent Tumberlin back to

the house for a cot, and the two removed the wounded man to the house. They were about eight or ten minutes getting back to the house with the deceased.

Cross-examined, the witness stated that he thought three horses crossed the bridge, going south, after the shooting. It was, by the witness's time-piece, a quarter to 10 o'clock when he and Tumberlin got the deceased into the house. According to his written testimony, witness stated at the inquest: "I approached him; he said 'Mr. Gagnan, I am shot.' I said 'Doctor, do you know who done the shooting?' He said 'Yes, Tom Pierson.'" Witness had no explanation of the apparent variance between his two statements, but thought that, considered in the light of all the circumstances, they meant the same thing. Here the State, on redirect examination, re-read the above statement from the written testimony, and, in addition, as following immediately: "Said I, 'Young Tom?' He said 'No; old Tom and Bob.'"

Isaac Baker testified that, in December, 1884, during the sickness of Ben Davis, he heard the defendant, speaking of the deceased, say that "the d—d old son-of-a-b—h ought to be killed; he is no doctor no how."

Ben Tumberlin testified that, on the night of the shooting, he was living with Gagnan. Witness went with Gagnan to the deceased, when he was shot. Doctor Stovall said that Tom and Bob Pierson had shot him through the hip. The question discussed in the eighth head-note of this report relates to the testimony of this witness and the previous witness Gagnan.

George Mann, colored, testified that he lived on Felix Smith's place, about sixty yards above Odenheimer's, and about seventy-five yards from the Lockhart road. He was in bed when the first shot was fired on the fatal night, but got up instantly, went to the door and heard five more shots, and saw three flashes. Witness heard two men ride rapidly across the bridge, followed by a riderless horse, which proved to be the deceased's. The men were going towards Bluff Springs. When they got opposite Odenheimer's one of them remarked: "Let us ride now, and delay no time." Witness knew that one of the horses crossing the bridge was riderless, because he heard the flopping of the stirrups; and that it was deceased's horse, because the horse that crossed the bridge stopped at Odenheimer's, where deceased's horse was presently found.

Justice of the Peace Von Rosenburg testified that he wrote down the dying statement of the deceased, just as the words fell from his lips. The State established by the witness the necessary predicate

and read the statement in evidence as follows: "It was Tom Pierson that shot me while I was on my return from Felix Smith's last night. Bob Pierson was with him. Tom was riding a sorrel, blazed-face horse. They had no cause to shoot me. I had not spoken to them a word, nor had I done anything to either of them. I was just murdered by them." (Signed) "J. C. Stovall."

William Johnson testified, for the State, that he was at Felix Smith's house when Doctor Stovall left there on the fatal night, but did not know at what hour he left. It was a quarter past 9 o'clock when Wade Smith, Felix's son, came into the room to set the clock. The clock spoken of by witness was the large one in the boys' room. Doctor Stovall had not gone when that clock was set. The clock in Mrs. Smith's room, which had not been running, was set by this clock. Witness heard one of the shots but paid no attention to it.

Jasper Grindstaff testified that he lived at Felix Smith's. Doctor Stovall left Smith's house, on the night he was shot, between a quarter and half-past 9 o'clock. Witness reached Gagnan's house just as Doctor Stovall was being carried through the yard gate on the cot. About fifteen minutes had then elapsed since Doctor Stovall left Felix Smith's. Witness did not go in at Gagnan's and did not see Gagnan's clock. As he went to Gagnan's the witness saw Doctor Stovall's horse near Odenheimer's and near the bridge. Odenheimer caught the horse and tied him to the fence. The clock which the little boy set was a small clock, and was not taken from the room. The boy set it, witness supposed, by the clock in witness's room, and then set the clock in Mrs. Smith's room, to give medicine by. The clock in the boys' room was a large eight-day clock. It was a quarter past 9 when the clock was set, and it was five or ten minutes later when Doctor Stovall left.

B. R. Carpenter testified, for the State, that young Austin Wallace was at his house on the Saturday night before the assassination, as an attendant upon a sick child. He left witness's house about twenty-five minutes past 7 o'clock, to go to Doctor Stovall's for medicine, and returned a little before 9.

M. D. Gagnan, recalled by the State, testified that Doctor Stovall, when taken to witness's house, was in a perfectly sane state of mind, and requested witness to apprise his family correctly of his condition.

Doctor L. B. Johnson testified, for the State, that he traveled from his former residence at Del Valle to Austin on the night of March 16, 1885, reaching Austin about 8 o'clock. It was a clear, starlight night; no moon, no clouds, no fog and no smoke.

By Ayer's almanac the State showed that on March 16, 1885, the sun rose at 6 o'clock and eight minutes, and set at 6 o'clock and nine minutes.

Sheriff Hornsby was the next witness for the State. He testified that he heard of the shooting about 2 o'clock on the morning of Tuesday, March 17, 1885. The messenger gave him some names used by Doctor Stovall. Witness sent word to Von Rosenburg to go to Gagnan's, and he, his brother, and Thorp went to the neighborhood of the killing. They reached defendant's house between daylight and sun up. As witness rode up to defendant's house, one of defendant's sons met him on the gallery, and witness asked him for defendant. Defendant stepped out and said: "Good morning, Mick; get down and come in." He had been putting on his pants and socks. Witness walked in behind him, and took a chair. Defendant walked towards a six-shooter scabbard hanging on the wall between his coat and hat, and witness called to him: "No monkey business here, Bob." Defendant then turned around, walked between witness and the door, and remarked: "You need not be uneasy." Witness told defendant, while the latter was putting on his pants, to hurry up; that he had a warrant for his arrest, and wanted to get back to town. Witness noticed three pistol belts and scabbards hanging on the wall between the coat and hat, and thought that each contained a pistol. Witness did not exhibit his warrant to defendant, but showed it to Mrs. Pierson. Witness went from the defendant's to where Doctor Stovall was lying, reaching there between 7 and 8 o'clock. Von Rosenburg was still there, but had already taken down Doctor Stovall's statement. Doctor Stovall's mind was, so far as the witness could judge, all right at that time. He was suffering a great deal, but was perfectly sane of mind. Speaking to the witness of his wound, Doctor Stovall said: "I see no chance to get well. I may die in an hour, or I may live twenty-four hours, but I will die."

Cross-examined, the witness said that he did not notice the make or material of the coat hanging up. He saw another coat lying on the table. Witness saw three pistol scabbards on the wall, and thought he saw one pistol when defendant moved in the direction of the wall, but of this he was not certain. As soon as defendant spoke, witness turned his eye upon him, and kept a watch on his wife and son. He watched "all points" closely, but did not know how many, if any, guns and pistols were in defendant's house. Fred Peck, Smith Hornsby, John Tulk and a man named Grindstaff were with the witness. Witness went into the house alone. The defense

admitted that the Costley trial, commencing on July 26 and closing July 31, 1883, transpired in the Travis county court-house. The State closed.

C. R. Gooden, for the defendant, testified that he lived near Pilot Knob, three quarters of a mile beyond defendant's house, who lived about nine miles from Austin. Witness came to Austin in a milk hack on the Saturday morning before the shooting of Doctor Stovall. He went home from Austin that evening in a buggy with John Robbins. They left Austin between 2 and 3 o'clock, crossed the river at Alley's ferry near Tinnin's ford, and Onion creek at the McKinney Falls. W. L. Rose lived on the Austin side of Onion creek, at the old McKinney rock house. Arriving at Rose's, witness and Robbins overhauled the witness's milk hack and Clark Jones, the driver, and Homer Gooden, who had stopped at Rose's to get out of the rain which was then falling. Bob Pierson and his wife were also there. Young Tom and young Bob Pierson passed witness and Robbins near the Catholic College, going towards home. Witness saw them again as he approached Rose's, and supposed that they too had stopped at Rose's to escape the rain. From Rose's to Bob Pierson's house the distance was about three miles. The rain-fall on that evening was very severe, and the roads were heavy and muddy. Witness and Robbins and the Piersons were traveling the same road, and were going in the same direction. Bob Pierson's house was reached between sundown and dark. It was four or five miles from Bob Pierson's house to the house in which the widow Pierson lived. Witness and defendant were good friends.

Mrs. Nancy Rose testified, for the defense, that in March, 1885, she lived in the old McKinney rock house on Onion creek. The defendant and his wife, who was the witness's sister, came to the witness's house about 2 o'clock on the Saturday evening before Doctor Stovall was shot. They brought with them their three daughters, Nancy, Susana and Frankie. They came in a wagon drawn by two gray horses, to get straw with which to fill some mattresses. It rained very hard on that evening after their arrival. The three girls did not go home with their father and mother, because of the recent sickness of the two younger ones; for which reason their father and mother did not care to expose them to the now damp atmosphere. The two boys, Bob and Tom, arrived at witness's house late in the evening, on their way home from Austin, and stopped to escape the rain. They remained at the house between one and two hours. Clark Jones, the driver of the milk wagon, and Homer Gooden were at the witness's house when the two boys

arrived. Bob Pierson and his wife, in their wagon, the boys Bob
and Tom on horseback, and Clark Jones and Homer Gooden in the
milk cart left the witness's house about the same time, going in the
same direction and towards Bob Pierson's house. Charley Gooden
passed the house that evening in a covered vehicle, traveling the
road traveled by Bob Pierson and the others, when they left. Wit-
ness saw no more of Bob Pierson or his wife on that evening after
they left her house. Bob, the defendant, returned alone, about 6
o'clock on the next morning, Sunday, and took his three daughters
home. On the evening of Monday, March 16, 1885, witness sent
some fish to Bob Pierson's family by Clark Jones, the milk peddler.
Bob Pierson's house was about three and a half miles from where
the witness lived.

Robert L. Pierson, Jr., testified, for the defense, that he was a son
of the defendant. Witness first heard of the shooting of Doctor
Stovall when his father was arrested, between sunrise and daylight
on the morning after it was alleged to have occurred. Witness and
Tom, junior, his brother, went to Austin on the Saturday morning be-
fore, and left Austin on their return between 3 and 4 o'clock. They
crossed the ford above the bridge, traveled the San Antonio road to
a point beyond the Deaf and Dumb Asylum, where they turned
east, passed the McCall place into the Stone's ferry road, and crossed
Onion creek at the old Tom McKinney place. They overtook and
passed John Robbins and Charley Gooden, in a buggy, near the Mc-
Call place. It rained rather hard, and witness and Tom stopped at
Rose's to escape the rain. At Rose's they found their father, the
defendant, their mother, three sisters, Clark Jones and Homer
Gooden. Witness's three sisters stayed at Rose's all night. Charley
Gooden and Robbins passed Rose's just as witness, Tom, his mother
and father were preparing to start home. Witness and Tom, on
horseback, and Jones and Homer Gooden, in the milk cart, started
about the same time, and defendant and his wife followed shortly.
Witness and Tom arrived at home between sundown and dark.
Tom had a fire made for their mother to cook supper when she ar-
rived. Witness's father, the defendant, took the horses out of the
wagon and the witness fed them. The only milk cow they had did
not come up until after dark, when she was turned into the lot by
the witness and the defendant. They ate supper on that night about
8 o'clock, and the defendant and his wife went to bed about half-
past 8. Witness went to bed at a very few minutes before 9 o'clock.
The defendant's house contained but three rooms, and the one occu-
pied by the defendant and his wife was the only room of the three

in which there was a fire-place. It was cool and chilly on that night, and, as the girls were not at home, Tom and witness slept in the same room with the defendant and their mother.

Clark Jones, for the defense, testified substantially as did the previous witnesses concerning the movements of the various parties named, on the Saturday previous to the shooting of Doctor Stovall. He located the time of the arrival of the defendant, his wife and two sons, at their home, on Saturday evening, at between sundown and dark. No person other than the Piersons, father, mother and sons, stopped at Bob Pierson's house. Witness did not know the hour when he and the Piersons left Rose's on that evening, going home. The atmosphere was misty, cloudy and dark. From Rose's to Pierson's the witness drove in a fast trot. Witness recollected taking some fish from Mrs. Rose to the Piersons, on Monday evening,— the evening of the shooting. He delivered the fish to Miss Nannie Pierson about a half hour before sunset. He saw no one on the place at that time but Miss Nannie.

Thomas Pierson, junior, the defendant's eldest son, testified in his behalf substantially as did his brother Robert, locating his father at home, in bed, on Saturday night, after half-past 8 o'clock and before 9.

Miss Nannie Pierson testified, for the defendant (who was her father), that she and her two sisters went with their mother and father to their Uncle Rose's on the Saturday previous to the shooting of Doctor Stovall. She testified as did the previous witnesses as to who stopped at Rose's house, and who passed it, on that day. She and her sisters stayed at Rose's that night. The sun was not shining, and the witness thought it had set when defendant, his wife and two sons left Rose's to go home. Clark Jones gave witness some fish, at her father's house, on Monday evening, about 5 o'clock. The fish had been sent by Mrs. Rose. Witness's mother and two sisters were at home when the fish were delivered, but the defendant and the two boys were not.

Doctor Q. C. Smith was the next witness for the defendant. He testified that he knew the deceased in his life-time. He met Doctor Stovall between 8 and 9 o'clock at night in January, 1885, at the residence of Mr. Trogden, about six miles distant from Austin. Doctor Stovall, on that night, speaking of his eye-sight, told witness that it was not then as good at night as it had been in former years, and mentioned one instance of his having lost his way in one of his neighbors's pasture. Mr. Trogden went with Doctor Stovall on that night to show him the way to Black's, and the doctor did not

get lost. That was a starlight night. As a general rule, a man who travels much at night can see better after dark than one unaccustomed to night travel. The defense proposed to prove by the witness the changes in eye-sight as age advances, produced by physiological causes; the manner of the change; the part of the eye that changes, and how such changes progress. This proof, however, the court rejected.

Pat Cain testified, for the defense, that he sat up at the widow Pierson's with 'Shack Pierson on one, but not the Sunday night before Doctor Stovall was shot. On the Sunday night alluded to by witness, Bob and Tom Pierson, Jasper Grindstaff and Bill Johnson were there. Witness did not recollect that Mr. and Mrs. Rose were there on that night. Witness was with John Tulk and Mr. Gatling, hunting for horse tracks, at Boggy bridge, on the morning after the shooting. He saw all sorts of tracks — cow, steer and horse tracks — under the bridge. Witness only noticed particularly the horse tracks there, and saw them under the bridge and up towards the water hole, indicating that the animals hunted better water than was attainable under the bridge. Witness could see no indication of a horse having stood under the bridge. Witness left the widow Pierson's on the Sunday night referred to about midnight, leaving defendant and Tom Pierson and "Black" Bill Johnson still there.

Cross-examined, the witness said that the examination for horse tracks under the bridge was made about a week after the Sunday night on which witness sat up at the widow Pierson's. Witness did not measure the tracks himself, but knew that they were measured by some one with a square and compass. Witness was at Felix Smith's on the night of the shooting, and was in the room when the clock was set, but took no notice of the time. Odenheimer brought the news of the shooting. It was the belief of the witness that measures were taken of horse tracks under the bridge, but he did not think that any tracks could be found there to correspond with horses' hoofs. Witness saw only "slide tracks," and such were the tracks measured.

Jules Delfraise, for the defense, after describing the topography of the country between the houses of defendant and Jim Smith, and the routes, roads and lanes leading between the two, testified that late on the fatal Monday evening, he was cutting wood at Jim Smith's wood pile, about one hundred yards from the road. While thus engaged, he saw two persons pass on horseback going towards Bob Pierson's. The first one passed about sundown, and the second one about twenty minutes later. The first person,— whether man

or woman the witness did not know,— rode a small black horse. The second wore a gray coat, but witness did not notice the color of his horse, though he noticed that the animal was of good size. The first person had passed through the second gate into the second pasture before the witness's attention was attracted. Witness did not remember how he was standing with reference to the fence, but he could see the parties plainly as they passed through the gate. When the witness saw the second person his view was in no way obstructed.

Cross-examined, the witness said that, according to his recollection, the second person, when he passed, had his side to witness, and witness could not tell whether he was white or black. He could not remember the gait in which either rode, but neither rode as fast as a gallop. He did not know the road they took after passing him, but if they kept the road they were then traveling, they would go to Bob Pierson's.

W. L. Rose, for the defense, testified that the defendant, his wife and three girls came to his house on the old McKinney place on the Saturday evening preceding the shooting of Doctor Stovall. Defendant and his wife left late in the evening, going home, and the girls stayed all night.

Mrs. Rachael Pierson, the wife of the defendant, was his next witness. She testified as did the previous witnesses for the defense respecting the movements of the defendant on the Saturday and Saturday night prior to the shooting of Doctor Stovall. She stated positively that the defendant retired between 8 and 9 o'clock on that night, and slept the whole of the night in the same bed with the witness. After the defendant got home with the girls on Sunday morning, he went direct to the house of his sister-in-law, the widow Pierson, to see about her sick son 'Shack, and her sick daughter. He left between 8 and 9 o'clock on that Sunday morning, and witness did not see him until good "dusky-dark" on the next or Monday evening,— the evening on which the shooting occurred. At that hour he came home, and witness proceeded at once to prepare supper, cooking the fish sent by Mrs. Rose. Reaching home at the hour designated, the defendant rode his horse (the bald-faced sorrel called "Gatlin") to the stable, unsaddled the horse, and brought the saddle, blankets, etc., to the house, and hung them up in the shed room. Witness fried the fish, Nannie cooked the bread and made coffee, and Susana spread the table. On that night, the fatal Monday night, witness, the defendant, young Bob and the three girls ate supper together, at defendant's house, after

dark and by lamp-light. At supper the defendant remarked that he wanted to retire. The witness, as soon as supper was over, arranged the bed, by lamp-light, and the defendant went to bed, as near as witness could state, about 7 o'clock.

The witness detailed circumstantially her movements about the house, and her employment from the hour that the defendant retired — about 7 o'clock — until she went to sleep, after 11 o'clock and a short time before 12, and declared positively and emphatically that, during that time, the defendant did not move from the room nor the bed in which he was sleeping. The arrest of the defendant early on the next morning fixed all of the facts testified to in the witness's mind. Sheriff Hornsby told witness, a few minutes before he left on the morning of the arrest, that Doctor Stovall was shot on the night before, and that the defendant had been accused of doing the shooting. When defendant left home on the Sunday morning before the shooting he had on the same gray suit that he wore on this trial.

Cross-examined, the witness stated that her son Tom stayed Monday night at the house of his uncle Tom, the co-defendant of Bob. He rode a bald-faced sorrel horse from home to Tom's on that evening. He returned home on Tuesday morning about 10 o'clock. Witness sent her son Bob on foot to Tom Pierson's after the arrest of her husband on Tuesday morning, the distance being about three miles. Bob did not bring back the bald-faced horse, but Tom, junior, did. Defendant always rode the bald-faced sorrel horse known as Gatlin. She could not say why he did not ride him to town on Tuesday morning, after his arrest.

"Black" Bill Johnson testified, for the defense, that he was at the widow Pierson's on the nights of Sunday and Monday, March 15 and 16, 1885. Defendant and Tom Pierson sat up there all of Sunday night. Witness did not see Doctor Cummings at the widow Pierson's on Sunday. Medicine was administered to 'Shack Pierson on Sunday night. Witness himself gave him a toddy. 'Shack's throat was swabbed with cotton moistened with the same kind of liquid. Defendant and Tom Pierson left the widow Pierson's for Austin between 7 and 8 o'clock on Monday morning. They returned, bringing medicine with them, between 2 and 3 o'clock in the evening, and left again about 4 o'clock. Witness heard three shots fired on Monday night. They were fired between 8 and 9 o'clock, according to old man Swank's watch, which was being used to administer medicine by.

On cross-examination, the district attorney read the witness's tes-

timony before the coroner's jury, as follows: "On Monday night after 9 o'clock, while I was out on the gallery at the widow Pierson's house, I heard two or three persons on horseback, in a gallop, coming from the direction of Boggy bridge towards widow Jane Pierson's." Witness stated that he heard the persons but a few moments after he heard the shooting, but had no recollection of saying before the coroner's jury that he heard the shooting after 9 o'clock. When he stated before the coroner's jury that Tom and Bob Pierson, without Mrs. Pierson's consent, employed Doctor Cummings and discharged Doctor Stovall, he meant that they employed Doctor Cummings without Mrs. Pierson's consent, and that Doctor Stovall's attention to 'Shack stopped. He could not say that the defendant and Tom discharged Doctor Stovall.

James W. Smith testified, for the defense, that he knew the defendant's two sorrel bald-faced horses, one known as the "Gatlin" and the other as the "Leverton" horse. Witness saw a sorrel bald-faced horse in Tom Pierson's or Wade Smith's field on Tuesday morning, March 17, 1885. It was not the "Gatlin" horse. The fence where the horse tracks were said to have been found was a rail fence. At that point the fence was so arranged that two rails could be withdrawn, making a gap. People frequently passed through that gap, particularly people who wanted to see the witness. Witness could not now say whether or not any parties came to see him on the 15th (16th?) of March. When witness saw the sorrel horse in Tom Pierson's field on Tuesday morning, young Tom Pierson was going towards him with a bridle. Tom Pierson, the witness thought, knew of the gap where the horse tracks were found.

The material part of the testimony of M. W. Davis, for the defense, was that, on Sunday, the day before the shooting, Mrs. Jane Pierson called Tom Pierson, telling him that 'Shack was awake and wanted him in the room; that Tom went into the room and was told by 'Shack to get him a doctor — this statement contradicting Mrs. Pierson's statement that she did not speak to Tom Pierson while he was at her house.

Miss Susana Pierson, testifying for the defense, corroborated her mother's testimony throughout, testifying positively that the defendant retired on Monday night very early, and did not get up before witness went to bed, about 9 o'clock, and was there on the next morning, not having left home during the night. Witness's brother, young Tom, went to old Tom Pierson's house about 4 o'clock on Monday evening, and spent the night.

Robert Pierson, Jr., recalled by the defense, testified that he left

home on Monday between 1 and 2 o'clock, and went to the widow Pierson's to see about the sick people. The defendant was not at Mrs. Pierson's while witness was there. Witness, however, saw him late on that evening at the house of his uncle Tom. Witness left his uncle Tom's about thirty minutes before sunset, riding a black pony about thirteen hands high. He passed along the road about seventy-five yards distant from Jim Smith's fence, but stopped nowhere until he got home. Witness reached home just about sundown, and his father arrived about ten or fifteen minutes later. Witness was then shucking corn. When his father, the defendant, arrived, he unsaddled his horse, helped the witness shuck corn, and then the two went to the house, the defendant taking his saddle with him. Defendant, his wife, witness and his sisters then ate supper. The defendant went to bed soon after supper. The witness did not retire until about half-past 8, which was some time after his father did. The family were all at home except witness's brother Tom when the witness got up next morning, the defendant being still in bed. The witness then detailed the circumstances of the arrest as did his mother, and stated that the sheriff and his party remained at the house not longer than five or ten minutes. Defendant rode witness's pony off with the sheriff, and witness turned the Gatlin and three gray horses into the pasture. Witness was sent to his uncle Tom's about 9 or 10 o'clock on Tuesday, by his mother. He did not find his brother Tom. When witness left home on Monday evening, going to the widow Pierson's, his brother Tom and John Pierson were with him, Tom riding the "Leverton" bald-faced sorrel horse. Witness saw Jules Delfraise cutting wood, as he passed Jim Smith's house.

Cross-examined, witness said that the sun was about a half hour high when he saw Jules Delfraise on Monday evening. Witness got home about sundown. Witness did not see John Tulk catch and measure the Gatlin horse's feet, but was hunting rabbits when that was done. There were no pistols about the defendant's house that witness knew of. Witness had owned a small pocket pistol, but had sold it to John Pierson for $1.50 on March 16, 1885. Defendant had Mr. Lou Robinson's pistol for some time after the Costley trial, but had returned it a year before this shooting, and had had none about the house since. There was but one, and not three pistol scabbards about defendant's house.

Miss Nannie Pierson was recalled by the defense. She testified positively that the defendant was at home and in bed from 7 o'clock on the night of Monday, March 16, until his arrest next morning

after day-break. Defendant retired shortly after he ate his supper. Witness did not lie down until after 9 o'clock, during which time the defendant remained in bed. Witness was awakened by her mother at 11 o'clock, and found her father still in bed. She did not go to bed until after 1 o'clock, when the defendant was still in bed, and he was still in bed next morning when the sheriff and posse arrived. Witness's brothers, Tom, riding the Leverton sorrel blaze-faced horse, and Bob, riding his black pony, went to the widow Pierson's with Johnny Pierson, on Monday evening. Witness's sister Frankie, who was subject to spasms when feverish, was sick on the said Monday night.

Doctor Joseph Cummings, the next witness for the defense, testified that, being called, he went to see 'Shack Pierson at the widow Pierson's on Sunday before the shooting. Being informed that Doctor Stovall had been in charge, he directed that Doctor Stovall should be told of the change of physicians. Witness went to see 'Shack again on Tuesday, and thence to see Frankie Pierson at defendant's house, as per request of the defendant, who, under arrest, rode by witness's office in Austin.

Mrs. Nancy Rose was recalled by the defense. She testified in substance that Bill Davis's child was sick at her house in January, 1885. She was treated by Doctor Stovall, who several times met the defendant there. They invariably spoke in a friendly manner to each other and shook hands. Doctor Stovall used "specs" in reading figures and the thermometer, while at witness's house treating Davis's daughter.

John C. Tulk, recalled by the defense, testified that on Monday morning, on their return with the defendant, they saw one of defendant's boys in Tom Pierson's lot, trying to catch a sorrel bald-faced horse. Defendant claimed the horse as his property. That animal was not the horse "Gatlin."

Cross-examined, witness said that he had lived within one hundred yards of Doctor Stovall for eight years, and had never known him to wear "specs." He had met Doctor Stovall hundreds of times at night. The doctor had good eye-sight, and would know anybody he was acquainted with. Witness measured all the feet of the sorrel ("Gatlin") horse in three different places — sides, length and width, using a compass and square. The measurement of the shoes at the heel corresponded with the sliding track at the bridge.

Tom Pierson, son of widow Pierson, and nephew of the defendant, testified, in substance, that he was in Austin with Bud Douglass on Monday morning, and saw the defendant and Tom

Pierson in town. Tom Pierson called witness from Douglass and one Titus, and told him that his brother 'Shack was sick, and to go on out home. Witness, who had been at work for Mr. Ward, had not then heard of his brother's illness. Witness did not go away from Bud Douglass to keep him from hearing what passed between him and his uncles.

Cross-examined, he said that he was at his mother's house on the night of the shooting and heard the shots, but did not say to Mr. Rose: "That is the crack of uncle Tom's pistol," nor: "That sounds like the crack of uncle Tom's pistol." He did say: "I reckon that is uncle Tom and John shooting at an owl or something." Witness did not know that his uncle Tom had a pistol, and would not have been able to recognize its "crack," if he did have one.

W. M. Davis, recalled by the defense, testified that he was present at the Costley trial. During that trial Doctor Stovall said that he wanted to make friends with defendant. Witness got them together, and they made friends, shook hands and talked to each other. Witness saw defendant and deceased shake hands and talk while his, witness's, child was sick at Rose's. He saw Doctor Stovall use spectacles once at Rose's.

Henry Givens, colored, for the defense, located the defendant near Pilot Knob and his home, between sundown and dusk, on the fatal Monday evening. He was then riding a bald-faced sorrel horse, going towards his home.

Tom Jones testified that he met the deceased near Swank's place, going towards Felix Smith's, between 7 and 8 o'clock on the fatal Monday night. Witness spoke to him. He did not know whether the doctor recognized him before he spoke, though he passed within two or three feet of him. When he said: "Good evening, doctor," the deceased replied: "Hello, Tom, is that you?" It was a dark and somewhat cloudy night.

Cross-examined, the witness said that he had been drunk on that day, but knew what he was doing. A man was sent along to open the gate for him, but witness could have got along quite well without him. The defense closed.

Mrs. Mary E. Stovall testified, for the State, in rebuttal, that Doctor Stovall was but forty-seven years old, had good eye-sight, and never wore glasses, never complained of failing eye-sight, and read a great deal at night. The night on which Doctor Stovall was shot was a bright, clear, unclouded starlight night.

Felix E. Smith, recalled, testified for the State that he had known

Doctor Stovall about nine years and had never known him to complain of failing eye-sight, nor to fail to recognize witness at night when he repeatedly met him traveling about, and had never known him to wear glasses.

John Robbins, for the State, in rebuttal, testified in substance that he drove Charley Gooden home from Austin on Monday, March 16, 1885, and that the sun was from thirty minutes to an hour high when they passed defendant's house, and the defendant and his wife reached their home about the time that witness and Gooden passed the house of defendant.

It is shown by a bill of exceptions, that, during the trial, and when defendant had made objection to Mrs. Doctor Stovall being examined in rebuttal on eye-sight and darkness of the night, etc., the presiding judge, in response to the objections made to her testifying, under the circumstances, conditions and connections, remarked to W. M. Walton, of counsel, in presence of the jury, who was to the left of the judge, and at a greater distance than the counsel, "The reason of the rule is to prevent collusion among witnesses, and the testimony (of defense) could not influence the witness on this subject."

The motion for new trial raised the questions discussed in the opinion.

*Walton, Hill & Walton,* and *Sheeks & Sneed,* filed an able and elaborate brief and argument for the appellant.

*J. H. Burts,* Assistant Attorney-General, for the State.

WILLSON, JUDGE. I. John A. Webb, when being examined upon his *voir dire* touching his qualifications as a juror in this case, stated as follows: "I am personally acquainted with the defendant Robert Pierson, and have known him for six or eight years. I am a hardware merchant in the city of Austin, and defendant has traded with my firm considerably. He has always been prompt in his dealings. He may now owe my firm a small amount of money. I also knew Doctor Stovall (the deceased), but not so well as I do the defendant. I merely knew him. I have both read and heard something about the case, but have not made up my mind from hearsay or otherwise as to the guilt or innocence of the defendant that would influence me in finding a verdict. I have liked the defendant very well ever since I became well acquainted with him. As a juror in the case, I should find a verdict according to the evidence under the law as given in charge by the court. I should dislike very much to find

him guilty." Thereupon the district attorney challenged the proposed juror for cause, the cause of challenge being that he was disqualified to serve as a juror in the case by reason of bias in favor of the defendant. This challenge was sustained, and the defendant excepted to this action of the court, and insists that it is error for which the conviction should be set aside.

One of the causes for challenge prescribed by our Code is that the proposed juror "has a bias or prejudice in favor of or against the defendant." (Code Crim. Proc., art. 636, subd. 12.) A *bias* in *favor* of a defendant is as much a cause for challenge as a *prejudice against* him. Mr. Webster defines the word "bias" as follows: "A leaning of the mind; propensity towards an object, not leaving the mind indifferent; inclination; prepossession; bent." This definition is applicable to the word as used in the above quoted article of the Code. Having in view this definition, did the trial judge err in holding that the proposed juror Webb was biased in favor of the defendant? We think he did not err in so holding. The statements of Webb clearly evince that there was a leaning of his mind, an inclination, a prepossession, a bent in favor of the defendant. His mind was not *indifferent* with respect to the defendant. He had known the defendant, and had business transactions with him for years past, and their business relations still continued. *He liked the defendant, and would dislike very much to find him guilty.* Suppose he had stated that he *disliked the defendant, and would like very much to find him guilty;* would he have been a proper person to serve as a juror in the case? We can perceive no difference in the instance we are considering and the one we have supposed, except that, in the former, *bias in favor of the defendant* is shown, while in the latter *prejudice against him* would be shown. In either case the proposed juror is not indifferent, not impartial, and should not serve as a juror. The leading and paramount object of our jury law is to secure impartial, fair minded men as jurors to try causes, civil and criminal, and more particularly criminal causes, where not only the life and liberty of the defendant may be involved, but also the peace, security and welfare of society. This right to have fair and impartial jurors is the right of the State as much as it is of the defendant. It is as much the right of the State to exclude from the jury a person who has a bias in favor of the defendant, as it is for the defendant to exclude one who is prejudiced against him. (*Mason* v. *The State*, 15 Texas Ct. App., 534.)

In treating upon this subject Mr. Chitty says: "The cases of such a challenge are manifestly numerous, and dependent upon a

variety of circumstances; for the question to be tried is, whether the juryman is altogether indifferent as he stands unsworn; because he may be, even unconsciously to himself, swayed to one side and indulge his own feelings, when he thinks he is influenced entirely by the weight of evidence." (1 Chitty's Cr. Law, 544.)

The law is exceedingly jealous of the purity of the jury box, and always has been. It seeks to shut up every avenue through which corruption or the influence of friendship, or any other improper influence, could possibly make an approach to it. It recognizes the fact that impartiality is the corner-stone of the fairness, security and advantages of trial by jury. It confides to the trial judge a very broad discretion in determining whether or not a person who is proposed as a juror is impartial and indifferent in the particular case to be tried. It is made his particular duty to carefully supervise the selection of the jury, and see that it is composed of persons who are qualified to serve, and who have neither bias in favor of, nor prejudice against, the defendant. In the discharge of this duty the judge may properly himself examine persons offered as jurors as to their competency and fitness. He should be fully satisfied of the fairness and impartiality of the person offered as a juror before allowing him to serve as such. It has been well said: "The rule is well settled that it is the duty of the court to superintend the selection of the jury, in order that it may be composed of fit persons. Large discretion must be confided to the trial court in the performance of this duty, nor will the action of the court in this behalf be made the subject of revision, unless some violation of the law is involved or the exercise of a gross or injurious discretion is shown." (Thompson & Merriam on Juries, § 258.) And it has been repeatedly held by this court that in determining as to the fitness of a juror, the question is one largely of discretion with the trial judge, and his action therein will not be revised by this court, unless it be made apparent that the discretion has been abused to the injury of the defendant's rights, or that the law has been infringed. (*Mason* v. *The State*, 15 Texas Ct. App., 534, and cases cited.)

And in *Dreyer* v. *The State*, 11 Texas Ct. App., 631, it was said: "In this country, where fair and impartial jurors can be had so readily, there is really no reason why questions of this character should arise, and in all cases where there is a possibility for serious doubt as to the impartiality of a juror, from whatever cause, the court, in the exercise of the discretion conferred upon it, should promptly discharge him." But while the discretion of the trial judge in this matter is indeed a broad one, it is by no means unlim-

ited or arbitrary. It has been more than once held by this court that the judge had no right to stand aside a qualified juror without the consent of the defendant; that such action would be an abuse of discretion, and would be reversible error. (*Hill* v. *The State*, 10 Texas Ct. App., 618; *Wade* v. *The State*, 12 Texas Ct. App., 357; *Greer* v. *The State*, 14 Texas Ct. App., 179; *Mason* v. *The State*, 15 Texas Ct. App., 534.)

In the case before us we are clearly of the opinion that the proposed juror had a bias in favor of the defendant, and was therefore disqualified to serve as a juror in the case; and the court ruled correctly in excluding him.

II. We find in the record several bills of exception reserved by the defendant both to the admission and exclusion of evidence. We will consider and dispose of them in their order.

*First.* The testimony of Felix E. Smith as to distances and localities, and as to the several ways of traveling from the defendant's house to that of Tom Pierson, his brother and co-defendant, was admissible. These were facts necessary to be shown in order to place before the jury facts which would enable them to understand and to determine the bearing and force of other facts in evidence, and to be put in evidence by the State. The charge of the State was that the defendant and Tom Pierson, acting together, had committed the murder. To support this charge it was relevant and proper to prove any facts and circumstances which would show, or tend to show, that they did or could have acted together in the commission of the deed. Their proximity to each other and to the place where the murder was committed; the topography of the country; the different ways of travel from place to place in that locality; and various other facts apparently irrelevant, might, in connection with other evidence, be not only relevant, but potent to establish the guilt of the defendant. That the relevancy or materiality of this testimony did not appear at the time it was offered did not require its exclusion. The district attorney in offering it stated to the court that it would be followed by other evidence which would so connect it with the issue to be tried as that its relevancy and materiality would be apparent. The court had the discretion to act upon this assurance of the district attorney and admit the testimony. (*Heard* v. *The State*, 9 Texas Ct. App., 1; *Avery* v. *The State*, 10 Texas Ct. App., 199.) By testimony thereafter adduced by the State, the relevancy and materiality of this portion of the testimony of the witness was clearly shown.

*Second.* There was no error in admitting the testimony of Mrs.

Jane Pierson as to the acts and words of Tom Pierson at her house on the day previous to the murder. This was a portion of the State's evidence offered for the purpose of showing a conspiracy between Tom Pierson and the defendant to commit the murder, and to show the motive or *animus* actuating them to commit the act. Of course this evidence would not be admissible against the defendant unless a conspiracy was shown to exist between Tom Pierson and the defendant to commit the murder, or unless it was shown that they acted together in the commission of it. But there was not only strong evidence to establish a conspiracy between them to kill the deceased, there was positive evidence that they did kill him, and acted together in doing it. (Whart. Cr. Ev., § 698; 3 Greenl. Ev., § 94; 1 Bish. Cr. Proc., §§ 1248, 1249; *O'Neal* v. *The State*, 14 Texas Ct. App., 582; *Phelps* v. *The State*, 15 Texas Ct. App., 45; *Hannon* v. *The State*, 5 Texas Ct. App., 549; *Phillips* v. *The State*, 6 Texas Ct. App., 364.) The objection made to the testimony of this witness, in regard to abusive remarks made by defendant about deceased, are objections to the credibility rather than the competency thereof, and the court did not err in refusing to exclude the same.

*Third.* It was not error to admit the testimony of the witness Odenheimer as to what he observed at Tom Pierson's house on the morning after the murder; nor to admit the testimony of the witness Tulk as to finding pistols at Tom Pierson's house on said morning. There was positive evidence that Tom Pierson and the defendant, acting together, committed the murder. Whilst the declarations of Tom Pierson, made *after* the consummation of the murder, and when the defendant was not present, would not be admissible evidence against the defendant, still any fact or circumstance which would tend to prove the guilt of Tom Pierson would also tend to prove the guilt of the defendant, and would be admissible against him, the evidence having directly connected them together in the commission of the offense. Such facts and circumstances would be corroborative of the direct evidence of their joint guilt. That Tom Pierson was found in bed at home on the next morning after the murder, while all the other members of the family were up, and that three pistols were found at his house, one of which had the appearance of having been recently discharged, were circumstances which, when considered in connection with the other evidence in the case, were relevant to prove the guilt of this defendant. They were independent, physical facts of an inculpatory nature, and were not acts and declarations of a co-conspirator, transpiring after the consummation of the crime.

*Fourth.* The testimony of Doctor Swearingen as to the question put to the deceased: "If he could have been mistaken about the parties who shot him," and the answer made thereto by the deceased: "I do not think it possible for me to be mistaken as to who shot me," was properly admitted. The question was not one calculated to lead the deceased to make any particular statement. (Code Crim. Proc., art. 748; *Hunnicutt* v. *The State, ante,* p. 498.)

*Fifth.* The testimony of the witnesses Gagnan and Tumberlin was properly admitted. The declarations by the deceased that were testified to by them were *res gestæ.* The declarations were almost coincident in point of time with the principal fact,— the shooting — and sprang out of and tended to explain that fact. They were voluntary and spontaneous. The mere fact that some of the declarations were made in response to questions asked does not take from them their voluntary and spontaneous character. The circumstances under which they were made clearly preclude the idea that they were not voluntarily and spontaneously uttered. (*Boothe* v. *The State,* 4 Texas Ct. App., 203; *Stagner* v. *The State,* 9 Texas Ct. App., 440; *Warren* v. *The State,* 9 Texas Ct. App., 619; *Foster* v. *The State,* 8 Texas Ct. App., 248; *Means* v. *The State,* 10 Texas Ct. App., 16; *Williams* v. *The State,* 10 Texas Ct. App., 528; *Hobbs* v. *The State,* 16 Texas Ct. App., 517.)

*Sixth.* It was within the sound discretion of the court to permit the State's witnesses to be recalled and re-examined in relation to the eye-sight of the deceased, and the darkness of the night of the homicide, notwithstanding these witnesses had been discharged from the rule, and had been present and heard the testimony of the defendant's witnesses upon these subjects. This was strictly in rebuttal of testimony introduced by the defendant, and related to matters which could not reasonably have been anticipated by the State, and about which the witnesses recalled by the State had peculiar opportunities of knowledge. In determining the propriety and necessity of permitting these witnesses to again testify in the case, the trial judge was vested with a wide discretion, which this court will not revise, as it does not appear to us that there has been any abuse of discretion. It was not within the power of the counsel of the parties, by any agreement entered into, to defeat or restrict this discretionary power vested by the law in the court. It was the duty of the trial judge, if in his judgment the testimony was essential to the ends of justice, and the witnesses were of a character not likely to be influenced in their statements by the testimony they had heard, to permit them to testify. In this instance

we think the trial judge exercised a sound discretion. (*Roach* v. *The State*, 41 Texas, 261; *Goins* v. *The State*, 41 Texas, 334; *Sherwood* v. *The State*, 42 Texas, 498; *Shields* v. *The State*, 8 Texas Ct. App., 427; *Estep* v. *The State*, 9 Texas Ct. App., 366; *Powell* v. *The State*, 13 Texas Ct. App., 244.)

As to the remark made by the trial judge to defendant's counsel in regard to permitting Mrs. Stovall to again testify in the case, it is not shown by the bill of exception taken thereto, that it was heard by the jurors or any of them, or that any injury could have resulted therefrom to the defendant. As presented by the bill of exception, we are not called upon to revise this action of the court.

*Seventh.* In regard to the bill of exceptions reserved to the ruling of the court in excluding the testimony of Doctor Q. C. Smith, as to the effect of advanced age upon the eye-sight, it is not shown what facts were expected to be proved by said witness. The question propounded to said witness is stated, but it is not stated what answer was expected to be elicited thereby. We are, therefore, unable to determine whether the testimony, if admissible, would have been material.

III. Exceptions were taken by the defendant to certain remarks made by the district attorney in his opening address to the jury, which remarks are set forth in the bill of exceptions. Upon the exception being made, the trial judge promptly told the jury that the remarks were outside the evidence, foreign to the issue in the case, and to pay no attention thereto. If the remarks were improper, the court as far as possible removed from the minds of the jury any injurious effects calculated to be produced thereby. But we can see nothing materially improper in the district attorney's remarks. He should not, perhaps, have expressed his *belief* in the defendant's guilt. Mr. Bishop, in speaking of counsel for the defendant, says: "No lawyer ought to undertake to be a witness for his client, except when he testifies under oath, and subjects himself to cross-examination, and speaks of what he personally knows. Therefore the practice, which seems to be tolerated in many courts, of counsel for defendants protesting in their addresses to the jury that they believe their clients to be innocent, should be frowned down and put down, and never be permitted to show itself more." (1 Bish. Cr. Proc., § 311.) We agree with the author in this view, and we think it applies equally to counsel for the prosecution. They should not intrude *their* belief in the guilt of the accused, upon the jury. But it is not probable that a jury would determine a case upon the *belief* of counsel, and especially when instructed by the court to disregard such remarks.

As to the other remarks of the district attorney which were objected to, we can perceive no impropriety in them. It was the duty of the district attorney, if he thought the evidence established the guilt of the defendant, to demand his conviction. He demanded a conviction in the name of the State, in the name of law, justice and right, in the name of society, in the name of the widow and children of the deceased. We see nothing wrong in this. If the defendant committed the murder, he had acted against the peace and dignity of the State; he had outraged law, justice, right and society; he had clothed the wife in widow's weeds, and had made fatherless the children of the deceased; and each and all of these consequences of his crime demanded his conviction and punishment.

It has become quite common to except to the remarks of counsel for the State in their addresses to the jury. We find such exceptions in the majority of contested cases that come before us. If we had sustained all these exceptions, the effect would have been to have virtually closed the mouths of prosecuting attorneys. While argument should be restricted legitimately, it should not be so unreasonably limited as to render it ineffectual. The State has rights in this respect as well as defendants. And in view of the frequency of exceptions of this character, we will take occasion here to say that before we will reverse a conviction because of remarks of prosecuting counsel, it must clearly appear to us, 1, that the remarks were improper, and, 2, that they were of a material character, and such as, under the circumstances, were calculated to injuriously affect the defendant's rights.

IV. There were no exceptions taken to the charge of the court, but several supposed errors therein are presented in the defendant's motion for new trial, in the assignment of errors, and in the brief of counsel for the defendant. We have carefully considered the charge in all of its parts, and with reference to every aspect of the case, and we find no error in it. In our opinion it contains all the law of the case, and is strictly and accurately applicable to the evidence. It is unnecessary that we should discuss the objections made to the charge in detail. None of the objections are, in our judgment, well grounded.

V. We will not recite or discuss the evidence in the case. The dying declarations of the deceased, which were properly admitted in evidence, were, of themselves, sufficient to warrant the verdict found by the jury.

We find no error in the record for which the conviction should be set aside, and the judgment is affirmed.                    *Affirmed.*

[Opinion delivered June 20, 1885.]